08-5328-ag
*Wong v. Holder*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2009

(Argued: March 22, 2010             Decided: February 1, 2011)

Docket No. 08-5328-ag

MEI FUN WONG, A.K.A. MEI FEN HUANG, LING GO,

*Petitioners*,

—v.—

UNITED STATES ATTORNEY GENERAL ERIC H. HOLDER, JR.,[1]

*Respondent*.

Before:

RAGGI, HALL, *Circuit Judges*, and CARMAN, *Judge*.[2]

---

[1] Pursuant to Federal Rule of Appellate Procedure 43(c)(2), United States Attorney General Eric H. Holder, Jr., is automatically substituted for former Attorney General Michael B. Mukasey as respondent in this case.

[2] Judge Gregory W. Carman of the United States Court of International Trade, sitting by designation.

Petition for review of a precedential decision of the Board of Immigration Appeals upholding an order of removal and ruling that, for purposes of evaluating a claim for relief from removal, the involuntary insertion of an intrauterine contraceptive device does not equate to involuntary sterilization or otherwise constitute persecution in the absence of aggravating circumstances and a nexus to petitioners' resistance to China's population control policy, neither of which was present in this case.

Petition for review DISMISSED in part, DENIED in part, and GRANTED in part. Order of removal VACATED and REMANDED for further proceedings consistent with this opinion.

_____

HENRY HWANG (Theodore N. Cox, *on the brief*), New York, New York, *for* Petitioners.

D. NICHOLAS HARLING, Trial Attorney (Tony West, Assistant Attorney General, Jamie M. Dowd, Senior Litigation Counsel, *on the brief*), Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington D.C., *for* Respondent.

_____

REENA RAGGI, *Circuit Judge*:

Chinese nationals Mei Fun Wong and her son Ling Go petition for review of an October 6, 2008 decision of the Board of Immigration Appeals ("BIA" or "Board"), upholding a March 1, 2002 order by Immigration Judge ("IJ") William F. Jankun, directing petitioners' removal from the United States and denying their applications for asylum, withholding of removal, and relief under the United Nations Convention Against Torture ("CAT"). See Matter of M-F-W- & L-G- ("In re M-F-W-"), 24 I. & N. Dec. 633 (B.I.A.

2

2008), aff'g Nos. A 76 641 112/113 (Immig. Ct. N.Y.C. Mar. 1, 2002).[3] Because Wong failed administratively to exhaust her challenges to the denial of withholding of removal and CAT relief, we dismiss this part of her petition for lack of jurisdiction. See 8 U.S.C. § 1252(d)(1). No such jurisdictional bar pertains to her petition for review of the denial of asylum. In this respect, Wong challenges BIA determinations, detailed in a precedential opinion, (1) rejecting Wong's argument that involuntary insertion of a contraceptive intrauterine device ("IUD") equates to "involuntary sterilization" as that term is used categorically to identify a political "refugee" under the Immigration and Nationality Act ("INA"), see 8 U.S.C. § 1101(a)(42); (2) requiring involuntary IUD insertion to be accompanied by aggravating circumstances to constitute "persecution" under the INA, see id.; and (3) finding no such aggravating circumstances demonstrated in this case.[4] Wong further challenges the BIA's determination that (4) in any event, she failed to establish the required nexus between the alleged harms inflicted and her resistance to China's population control policy.

Wong's assertion that involuntary IUD insertion equates to sterilization is now foreclosed by our decision in Xia Fan Huang v. Holder, 591 F.3d 124 (2d Cir. 2010). For

---

[3] As Ling Go's application for relief from removal is wholly derivative of his mother's, in this opinion we generally refer only to Wong in discussing petitioners' claims.

[4] Although our precedents sometimes use the modifiers "involuntary" and "forced" interchangeably in discussing Chinese population control procedures performed without a person's consent, in this opinion we limit ourselves to the former term to avoid the suggestion of physical coercion that might be implied by the term "forced."

reasons discussed herein, we defer to the BIA's interpretation of the INA to preclude categorical treatment of involuntary IUD insertion as persecution and, thus, to the agency's requirement for some demonstration of accompanying aggravating circumstances to establish persecution. At the same time, however, we conclude that the BIA did not sufficiently identify the standards it applied in determining that neither aggravating circumstances nor nexus were established in this case, without which we cannot review its decision. Accordingly, we vacate the order of removal and remand for the agency to rectify this omission.

## I.    Background

### A.    The Factual Basis for Petitioner's Claim of Past Persecution

On January 17, 2000, Wong and her then nine-year-old son attempted to enter the United States through Seattle, Washington, without valid entry documents. Before the Immigration and Naturalization Service, Wong conceded her removability and sought asylum and other relief from removal based on a fear of future persecution. The basis for her fear was professed past persecution evidenced by her subjection to involuntary insertion of an IUD in furtherance of China's population control policy.

Testifying in support of her application in 2002, Wong essentially relied on facts stated in her asylum application and accompanying declaration. Wong stated that she was born in Fuzhou, China, where she married in 1989 and gave birth to her son on July 23, 1990. Wong's husband purportedly fled China for the United States in April 1990 to avoid

4

persecution for his support of the student movement that culminated in the 1989 Tiananmen Square massacre.[5]

About a year after Wong's husband left China, on April 24, 1991, Chinese family planning officials required her to have an IUD inserted. Finding the device painful, Wong requested its removal during one of her required quarterly gynecological examinations. With official permission denied, Wong arranged for a private doctor to remove the IUD in May 1992. When her actions were discovered in the course of a January 1993 gynecological examination, Wong refused to have another IUD inserted "because I was afraid of the pain and problems it caused." Decl. in Supp. of Asylum Appl. at 2. As a result, she was detained without harm for three days until she "finally succumbed to wearing another IUD" and her mother-in-law paid a "bribe," ostensibly a fine for Wong missing gynecological examinations, to secure her release. Id.

Five years later, in January 1998, Wong attempted to leave China to avoid what she characterized as the "continual torture and torment" of wearing an IUD. Id. Stopped in Hong Kong, she was jailed there for four months, again without harm, before being returned to the mainland. There, she was fined 20,000 RMB for leaving China illegally and for

---

[5]Although her husband's asylum claim was denied on this ground, Wong was apparently living with him in New York at the time of her own asylum hearing. Wong's mother and brother were then also residing in the United States, her mother as a lawful permanent resident, having been in the United States for some eight to nine years at the time of the 2002 hearing, and her brother as a United States citizen. The brother had filed an immigration application for Wong that was pending at the time of her asylum hearing. The record before this court provides no further information pertaining to this application.

continuing to miss gynecological examinations. Wong stated that she paid the fine under threat that she would otherwise be jailed and her son prohibited from attending school.

Wong asserted that, thereafter, she continued to feel that family planning officials were "harassing" and "menacing" her, although she provided no particulars. Id. at 3. Characterizing her life as "unbearable," Wong stated that she "decided to leave China and to end the torture." Id. Accordingly, in January 2000, Wong fled to the United States, where she sought asylum.

Sometime in 2000, in New York, Wong had her IUD removed. The following year, she and her husband conceived a second child, who was due to be born in April 2002. In March 2002, Wong testified that if she were removed to China before delivering her child, she would be forced to undergo an abortion; if she were removed after delivering her child, she would be involuntarily sterilized.

B.     Agency Proceedings

At the conclusion of the hearing on Wong's claims for relief from removal, the IJ issued an adverse oral decision. Preliminarily, the IJ expressed serious reservations as to the credibility of Wong's overall account. Although Wong claimed that she was compelled to wear an IUD after the birth of her son, the IJ noted that a 1998 State Department report stated that in Wong's province, IUD usage was mandated only for families that had two children.[6]

---

[6] The IJ also noted that during her initial airport interview, Wong made no mention of being compelled to wear an IUD, although she professed a fear of arrest if returned to China, acknowledged being told what to do and say upon arrival in the United States by her

6

See Bureau of Democracy, Human Rights, and Labor, U.S. Dep't of State, China: Profile of Asylum Claims and Country Conditions 25 (1998).  Further, he pointed out inconsistencies between Wong's assertions and those made by her husband in support of his asylum application.  Wong testified that from the time of their marriage (which she alternatively reported as May 31, 1989, and June 31, 1989) until her husband's departure from China in April 1990, the couple had always lived together in their home.  By contrast, her husband had asserted that Chinese authorities came to the home in June 1989, prompting him to escape the premises and to hide with relatives until his departure from China the following year.  Further, in a 1995 application for advanced parole, Wong's husband sought permission to return to China, professing a need to care for his dying wife who had been seriously injured in a traffic accident.  Wong never reported being near death while in China.

Despite these reservations, the IJ did not rely on an adverse credibility finding to deny Wong relief from removal.  Instead, he concluded that, even if Wong's account were credited,[7] she failed to qualify for relief from removal because she had not demonstrated a well-founded fear that she would be forced to undergo abortion or sterilization, or would be subjected to arrest, if returned to China.  Nor had she demonstrated that involuntary

husband (with whom she had spoken five days earlier), and reported paying a smuggler $60,000 to help her leave China.  It was ten days later, in a "credible fear interview" with an asylum officer, that Wong first recounted the IUD experiences that formed the basis for her asylum claim.

[7] On appeal, the BIA similarly assumed the credibility of Wong's account and we, therefore, do likewise.

7

reinsertion of an IUD constituted past persecution.

The BIA summarily affirmed the IJ decision. Before this court considered Wong's initial petition for review of this decision, the parties submitted and we so ordered a stipulation to remand the case to the BIA for it to "explain the bases for its conclusion that the forcible insertion of an IUD, and any attendant pain or discomfort, does not fall within the amended definition of refugee." Wong v. Ashcroft, No. 03-40823-ag, at 2 (2d Cir. Apr. 28, 2006) (Stipulation and Order of Settlement and Dismissal).[8] The BIA provided that explanation in a precedential opinion filed on October 6, 2008. See In re M-F-W-, 24 I. & N. Dec. 633. Rather than discuss that opinion in detail here, we do so in addressing Wong's petition challenges.

## II. Discussion

### A. Jurisdiction and Standards of Review

Our jurisdiction to review final orders of removal is established by 8 U.S.C. § 1252. Where, as here, the BIA issues a decision independent of the IJ, we review the BIA's decision alone. See Xia Fan Huang v. Holder, 591 F.3d at 127; Belortaja v. Gonzales, 484 F.3d 619, 623 (2d Cir. 2007). We review the agency's factual findings under the substantial

---

[8] The stipulation also required the BIA to address, after further briefing, Wong's claim that she feared future persecution in China based on the birth of her second child in the United States. To the extent this claim was decided against her on remand, Wong does not pursue it on appeal and, thus, we deem the point forfeited. See Hicks v. Baines, 593 F.3d 159, 166 n.5 (2d Cir. 2010) ("Issues not sufficiently argued in the briefs are considered forfeited and normally will not be addressed on appeal." (internal quotation marks and brackets omitted)).

evidence standard, treating them as "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); see also Yanqin Weng v. Holder, 562 F.3d 510, 513 (2d Cir. 2009). Thus, because the agency assumed the credibility of Wong's factual account despite reservations raised by record inconsistencies, we do likewise. We review questions of law and the BIA's application of law to undisputed fact de novo. See Yanqin Weng v. Holder, 562 F.3d at 513. Nevertheless, when reviewing the BIA's interpretation of the INA, a statute it administers, we defer to the agency's interpretation so long as it is reasonable in light of the two-step analysis set forth in Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-44 (1984). See Xia Fan Huang v. Holder, 591 F.3d at 129-30 (deferring to agency interpretation of INA as reasonable); cf. Shi Liang Lin v. U.S. Dep't of Justice, 494 F.3d 296, 309 (2d Cir. 2007) (en banc) (rejecting agency interpretation of INA as contrary to unambiguous statutory language).

B.     The Statutory Scheme

The INA authorizes the Attorney General, in his discretion, to grant asylum to an alien who qualifies as a "refugee," defined under the INA as one who is "unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of [his or her native] country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . . ." 8 U.S.C. § 1101(a)(42); see also 8 C.F.R. § 1208.14(a). An asylum applicant bears the

burden of establishing through credible evidence that he suffered past persecution or has a well-founded fear of future persecution if removed from the United States. See 8 C.F.R. § 1208.13(a)-(b); Dong Zhong Zheng v. Mukasey, 552 F.3d 277, 284 (2d Cir. 2009). A showing of past persecution gives rise to a rebuttable presumption of a well-founded fear of future persecution. See id. (citing Poradisova v. Gonzales, 420 F.3d 70, 78 (2d Cir. 2005)).

How to apply these principles to persons seeking asylum based on opposition to China's population control policy has challenged both the agency and the courts. The issue is complicated by both political and practical concerns. As to the first, few societies have valued individual liberty as strongly as our own or erected such high legal barriers to government intrusion on personal freedom. Thus, it is not surprising that other governments' restraints on personal autonomy strike us as oppressive. See Zhou Yun Zhang v. INS, 386 F.3d 66, 70 (2d Cir. 2004) (observing that in "world inhabited by more than six billion people, most of whom live in societies that we in the United States would consider oppressive for a variety of reasons, it is hardly surprising that thousands of refugees continue to present themselves at our borders each year seeking asylum"). Which of these restraints rise to the level of persecution warranting asylum is not always easy to determine. As for practical considerations, China's population control policy applies in a country of more than 1.3 billion people. The persons opposed to the policy, i.e., the potential applicants for asylum in the United States from that policy, could therefore easily number in the millions. Further complicating the issue is the ease with which opposition to the state's population policy

10

might be invoked to support asylum claims by large numbers of Chinese nationals whose real reason for seeking entry into the United States is the historic motivation for generations of immigrants: the search for better economic opportunities. See id. at 72.

Prior to 1996, the BIA apparently balanced these concerns by construing the INA to permit persons opposed to China's population control policy to claim refugee status only if they demonstrated that the policy "had been 'selectively applied' to them on the basis of a protected ground." Shi Liang Lin v. U.S. Dep't of Justice, 494 F.3d at 335 (Calabresi, J., concurring in part and dissenting in part) (quoting Matter of Chang, 20 I. & N. Dec. 38, 44 (B.I.A. 1989)). In response to reports that China was enforcing its population control policy through forced abortions and sterilizations, however, Congress legislatively recalibrated the balance to ensure that persons subjected to such treatment qualified as refugees. Section § 601(a) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009-546 (codified at 8 U.S.C. § 1101 et seq.), states:

> [A] person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.

8 U.S.C. § 1101(a)(42); see also Shi Liang Lin v. U.S. Dep't of Justice, 494 F.3d at 305-07

11

(discussing scope of amendment); Ke Zhen Zhao v. U.S. Dep't of Justice, 265 F.3d 83, 91-92 (2d Cir. 2001) (discussing background to change in law).

Thus, after 1996, aliens compelled to undergo involuntary abortion or sterilization, or who refused to undergo these procedures, categorically qualify as refugees. They need not establish their own political motivation or that of their persecutors; "their political opinion exists de jure rather than as a matter of fact on which the applicant bears the burden of proof." Shi Liang Lin v. U.S. Dep't of Justice, 494 F.3d at 307.[9] At the same time, Congress provided that persons not subjected to abortion or sterilization but who claimed persecution on account of "other resistance to a coercive population control program" might also qualify as refugees, but only upon showing that (1) they resisted the population program, (2) they suffered persecution, and (3) the persecution was inflicted on account of their resistance. 8 U.S.C. § 1101(a)(42).

C.    The BIA's Ruling

In dismissing Wong's appeal, the BIA concluded as a matter of law that involuntary IUD insertion does not equate to involuntary sterilization under the INA and, therefore, that Wong was not a refugee per se. See In re M-F-W-, 24 I. & N. Dec. at 636. In so ruling, the

_____

[9] The BIA would subsequently conclude, upon en banc review, that the coerced abortion or sterilization of one spouse could support a derivative claim for asylum by the other spouse, even when the spouse who was the direct victim remained in China. See In re C-Y-Z-, 21 I. & N. Dec. 915, 917-19 (B.I.A. 1997) (en banc). This court, however, also upon en banc review, concluded that the BIA's interpretation of the INA to support such a derivative claim was incorrect. See Shi Liang Lin v. U.S. Dep't of Justice, 494 F.3d at 304-05.

12

BIA highlighted "the permanency of the sterilization procedure," which renders a person "incapable of having children." Id. (emphasis in original). By contrast, the Board characterized IUD use as a "temporary measure meant to provide for birth planning and not to remove all possibility of future birth opportunities." Id. (emphasis in original).

Turning to the "other resistance" prong of the INA's definition of refugee, the Board concluded that unauthorized removal of an IUD and failure to attend gynecological exams can, and in Wong's case did, constitute resistance to China's population control policy within the meaning of 8 U.S.C. § 1101(a)(42), "because such acts, while arguably not comprising active or forceful opposition to China's family planning policy, would certainly thwart the goals of the plan and be viewed with disfavor by Chinese officials implementing the plan."[10] Id. at 638, 643-44; see also In re S-L-L-, 24 I. & N. Dec. 1, 10 (B.I.A. 2006) (construing resistance to cover "wide range of circumstances, including expressions of general opposition, attempts to interfere with enforcement of government policy in particular cases, and other overt forms of resistance to the requirements of family planning law"). Nevertheless, the Board ruled that involuntary IUD insertion in response to such resistance does not categorically constitute persecution. An asylum applicant must adduce some evidence of aggravating circumstances, which the BIA found were not present in Wong's

---

[10] Although Wong stated that she removed her first IUD and opposed insertion of another because of the pain and discomfort caused by the device, not because of a desire to have another child, the BIA's determination that Wong's actions qualified as resistance to the population control policy is unchallenged and, thus, we have no reason to review it.

13

case.  See In re M-F-W-, 24 I. & N. Dec. at 642-44.  Further, the BIA concluded that Wong had failed to show that her alleged harms were inflicted on account of her resistance to China's population control policy, because the actions of which she complained were simply intended to secure compliance with the policy.  See id. at 644.

D.     Wong's Challenge to the BIA Ruling

1.     Failure to Equate IUD Insertion with Sterilization

Wong submits that the BIA erred in failing to construe involuntary IUD insertion as the equivalent of involuntary sterilization for purposes of identifying an alien as a refugee under the INA.  This argument must be rejected after Xia Fan Huang v. Holder, 591 F.3d 124, in which this court accorded Chevron deference to the BIA's challenged construction.  See id. at 129.  In so holding, we observed, first, that the INA is silent as to whether IUD insertion constitutes sterilization.  See id.  Second, we determined that the BIA's conclusion that involuntary IUD insertion did not constitute involuntary sterilization was reasonable and, therefore, entitled to deference.  Id. at 129-30.

Panels of this court are, of course, now bound by our holding in Huang, and we would not, in any event, be inclined to hold otherwise.  Indeed, we note that the Third Circuit has recently cited approvingly to Huang in reaching the same conclusion.  See Fei Mei Cheng v. Attorney Gen. of U.S., 623 F.3d 175, 187-88 (3d Cir. 2010) (upholding BIA's determination that involuntary IUD insertion does not constitute involuntary sterilization).

Accordingly, because we identify no merit in Wong's argument that she qualifies as

14

a refugee because she was involuntarily sterilized, we deny this part of her petition for review.[11]

### 2. Requirement that Involuntary IUD Insertion Be Accompanied by Aggravating Circumstances To Constitute Persecution on Account of Other Resistance

The BIA concluded – and the government does not dispute – that the removal of an IUD or the failure to attend mandatory gynecological appointments can constitute "other resistance" to China's population control policy and that Wong exhibited such resistance by removing her first IUD and refusing to have a second one inserted for three days while she was detained. See In re M-F-W-, 24 I. & N. Dec. at 638, 643-44. Thus, we need here consider only Wong's challenge to the Board's determination that she failed to demonstrate that she was persecuted for such resistance.

### a. The "Aggravating Circumstances" Requirement Is Reasonable in Light of Congress's Failure To Treat Involuntary IUD Insertion, Like Involuntary Abortion and Sterilization, as Per Se Persecution

Wong argues that the BIA erred in construing the INA to require that involuntary IUD insertion be accompanied by aggravating circumstances to demonstrate persecution. She submits that the invasion of personal autonomy and the restraint on liberty inherent in

___

[11] In urging otherwise, Wong suggested at oral argument that Huang did not consider whether involuntary IUD insertion coupled with mandatory gynecological exams constitutes sterilization. We disagree. Huang expressly rejected the petitioner's argument that "the cumulative effect of having an IUD inserted and regularly examined constitutes sterilization." Xia Fan Huang v. Holder, 591 F.3d at 129.

15

involuntary IUD insertion are alone sufficient to demonstrate persecution. Neither the BIA nor this court can consider the relative merits of such an argument in the abstract. Rather, we must consider it in the context of a statutory scheme in which Congress identified only two involuntary procedures for population control – abortion and sterilization – as per se persecution. In that context, we conclude that the BIA's construction of the statute was not unreasonable.

(1)     The INA's Failure To Define "Persecution"

Although "persecution" is the "fundamental concept at the core of the [INA's] refugee definition," In re T-Z-, 24 I. & N. Dec. 163, 167 (B.I.A. 2007), the term is not statutorily defined and courts have not "settled on a single, uniform definition," Ivanishvili v. U.S. Dep't of Justice, 433 F.3d 332, 340 (2d Cir. 2006) (citing Aguilar-Solis v. INS, 168 F.3d 565, 569 (1st Cir. 1999)). This court has described persecution as "the infliction of suffering or harm upon those who differ on the basis of a protected statutory ground," Ivanishvili v. U.S. Dep't of Justice, 433 F.3d at 341, a definition that closely tracks that developed by the BIA, see In re S-A-, 22 I. & N. Dec. 1328, 1336 (B.I.A. 2000) (defining persecution as "the infliction of suffering or harm upon those who differ (in race, religion or political opinion) in a way regarded as offensive" (internal quotation marks omitted) (quoted in Ivanishvili v. U.S. Dep't of Justice, 433 F.3d at 341)). Such a definition is sufficiently general to encompass "a variety of forms of adverse treatment, including non-life-threatening violence and physical abuse, or non-physical forms of harm such as the deliberate imposition of a

16

substantial economic disadvantage." Ivanishvili v. U.S. Dep't of Justice, 433 F.3d at 341 (internal quotation marks, citation, and brackets omitted); see also Edimo-Doualla v. Gonzales, 464 F.3d 276, 283 (2d Cir. 2006) (instructing that series of incidents, none of which alone rise to level of persecution, may do so when viewed cumulatively).

The difficulty with identifying the boundaries of such a general concept is evident in our precedent. We have emphasized that persecution is "an extreme concept that does not include every sort of treatment our society regards as offensive." Ai Feng Yuan v. U.S. Dep't of Justice, 416 F.3d 192, 198 (2d Cir. 2005) (internal quotation marks omitted); see also Fatin v. INS, 12 F.3d 1233, 1240 (3d Cir. 1993) (Alito, J.) ("[P]ersecution does not encompass all treatment that our society regards as unfair, unjust, or even unlawful or unconstitutional."). At the same time, we have admonished the BIA to be "keenly sensitive" to the fact that what might be viewed as "mere harassment" in some circumstances "can take on an entirely different character when officially inflicted on an individual while detained on account of protected grounds." Beskovic v. Gonzales, 467 F.3d 223, 226 (2d Cir. 2006) (observing that "minor beating" may constitute persecution when inflicted on detainee by government authorities on account of protected ground); see Ivanishvili v. U.S. Dep't of Justice, 433 F.3d at 342 ("[P]hysical abuse and violence at the hands of government agents . . . [,] if credible, may preclude a finding that the conduct is mere harassment that does not as a matter of law rise to the level of persecution, for violent conduct generally goes beyond the mere annoyance and distress that characterize harassment.").

17

(2)     Caselaw Urging BIA Guidance on Whether Involuntary
        IUD Insertion Constitutes Persecution

Any involuntary IUD insertion, even one conducted according to the same medical procedures as a voluntary IUD insertion, involves a serious violation of personal privacy and deprives a woman of autonomy in making decisions about whether to bear a child. See Qiao Hua Li v. Gonzales, 405 F.3d 171, 179 (4th Cir. 2005). Nevertheless, in the years preceding the BIA's decision in In re M-F-W-, courts of appeals had taken "an array of positions" on whether, and under what circumstances, involuntary IUD insertion constitutes persecution. Ying Zheng v. Gonzales, 497 F.3d 201, 203 (2d Cir. 2007). More to the point, the courts repeatedly solicited BIA guidance on the issue. See id. at 203 (remanding with observation that "BIA has not yet opined on this issue in a published, precedential opinion, thus depriving the bench, the bar and potential asylum applicants of guidance concerning whether and how they might approach the issue"); Chao Qun Jiang v. Bureau of Citizenship & Immig. Servs., 520 F.3d 132, 135 (2d Cir. 2008) ("To further the goals of uniformity and fairness that prompted our remand on the same issue in Ying Zheng, we remand this case to the BIA for it to articulate a consistent position on whether and under what conditions forced insertion of an IUD constitutes persecution." (internal quotation marks omitted)); see also, Li Fang Lin v. Mukasey, 517 F.3d 685, 693-94 (4th Cir. 2008) (remanding where BIA left unclear "how [it] factored the 'temporary' nature of IUD insertion and usage into its overall persecution calculus, i.e., whether forced IUD insertion and continued usage is never persecution or whether it is not persecution only because it did not deprive [petitioner] of a significant

18

portion of her reproductive life"); Feng Chai Yang v. U.S. Attorney Gen., 418 F.3d 1198, 1205 (11th Cir. 2005) (remanding for consideration of whether two IUDs inserted against petitioner's will "could be construed as 'other resistance to China's birth control policies'"); Yahong Zheng v. Gonzales, 409 F.3d 804, 811-12 (7th Cir. 2005) (observing that "no court of appeals has decided whether persecution . . . can be established on the basis of forcible IUD insertions alone" and remanding because BIA assumed the answer arguendo, providing "scant basis for review"); Meng Rong Fang v. Ashcroft, 114 F. App'x 486, 488 (3d Cir. 2004) (unpublished) (remanding in absence of BIA or circuit authority on "whether a woman who unwillingly acquiesced to obtaining an IUD has been persecuted under the [other resistance] clause" and seeking "Board's considered views" (internal quotation marks and alteration omitted)).

The BIA attempted to provide this guidance in In re M-F-W-. See 24 I. & N. Dec. at 637 n.5 (collecting cases and noting that "guidance on this issue is necessary").

### (3) The BIA's Articulation of the "Aggravating Circumstances" Requirement

In re M-F-W- holds that "simply requiring a woman to use an IUD, and other more routine methods of China's implementation of its family planning policy, do not generally rise to the level of harm required to establish persecution." Id. at 640. Rather, "to rise to the level of harm necessary to constitute 'persecution,' the insertion of an IUD must involve aggravating circumstances." Id. at 642. In reaching this conclusion, the Board did not minimize the serious violation of liberty represented by an involuntary IUD insertion. See

19

id. at 640 (acknowledging that "having an IUD inserted involuntarily is certainly intrusive and hinders a person's ability to control procreation"). Rather, it grounded the demand for some evidence of aggravating circumstances in an assessment of Congress's intent in amending the statutory definition of refugee in 1996.

The Board concluded that those amendments were intended to afford categorical refugee status to the two classes of persons whom "Congress understood to be most deserving of protection," i.e., those subjected to either involuntary abortion or involuntary sterilization. Id. at 641 (quoting Shi Liang Lin v. U.S. Dep't of Justice, 494 F.3d at 312). The BIA identified no basis for concluding that Congress also "intended to include IUD insertion or removal as an automatic basis for gaining relief" from removal. Id.

When, as here, the BIA interprets ambiguous language in the INA in a precedential decision, we defer to that interpretation so long as it is reasonable under the two-step analysis set forth in Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. at 843-44. See INS v. Aguirre-Aguirre, 526 U.S. 415, 425 (1999) ("[T]he BIA should be accorded Chevron deference as it gives ambiguous statutory terms concrete meaning through a process of case-by-case adjudication." (internal quotation marks omitted)). As we have already observed, the INA does not specifically address whether involuntary IUD insertion constitutes persecution. Because the "statute is silent or ambiguous with respect to the specific issue," step one of the Chevron analysis is satisfied, and we proceed to step two, asking whether the agency's interpretation "is based on a permissible construction of the

20

statute," Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. at 843, and deferring to any reasonable interpretation by the Board, see Kuhali v. Reno, 266 F.3d 93, 102 (2d Cir. 2001) (citing INS v. Aguirre-Aguirre, 526 U.S. at 424-25).

We conclude that the Board's interpretation is reasonable. There is no question that, at the time it amended the statutory definition of refugee, Congress was aware that mandatory IUD insertions, like mandatory abortions and sterilizations, were employed by China to carry out its population control program. See, e.g., Coercive Population Control in China: Hearings Before the Subcomm. on Int'l Operations & Human Rights of the House Comm. on Int'l Relations, 104th Cong. 89 (1995) (statement of John S. Aird, former Senior Research Specialist on China at the U.S. Bureau of the Census) (noting "upward trend in [coerced] IUD insertions" in China); see also Patrick E. Tyler, Birth Control in China: Coercion and Evasion, N.Y. Times, June 25, 1995, at A1 (reporting that Communist Party in China urged "sterilizations or verified insertions of [IUDs] to thwart additional pregnancies"). Nevertheless, Congress determined that only persons subjected to involuntary abortions or sterilizations would qualify as per se refugees under the amended statutory definition.

Against this background, the Board's conclusion – that Congress did not intend for all involuntary IUD insertions to be treated as per se persecution – must be viewed as a rational interpretation of congressional purpose and not as "arbitrary, capricious, or manifestly contrary to the statute." Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. at 844. While this is the first time we so conclude in a published opinion, this

21

holding is consistent with a number of our unpublished decisions that have already deferred to the Board's rationale on this issue. See Xue Mei Lin v. Holder, No. 09-1662-ag, 2010 WL 4137151, at *2 (2d Cir. Oct. 21, 2010) (Summary Order) (citing In re M-F-W-, 24 I. & N. Dec. at 640-42, in concluding that "BIA reasonably concluded that [petitioner] failed to establish that insertion of the IUD constituted past persecution"); Xiu Mei Chen v. Holder, 388 F. App'x 49, 51 (2d Cir. 2010) (citing In re M-F-W-, 24 I. & N. Dec. at 642, in holding that record did not compel conclusion that involuntary insertion of IUD "was accompanied by 'aggravating circumstances' rising to the level of persecution"); Ping Lin v. Holder, 387 F. App'x 93, 95-96 (2d Cir. 2010) (citing In re M-F-W-, 24 I. & N. Dec. at 639-42, in concluding that petitioner failed to demonstrate "'aggravating circumstances' sufficient to render the insertion of her IUD persecutive"); Chun Mei Ying v. Holder, 374 F. App'x 111, 113 (2d Cir. 2010) (citing In re M-F-W-, 24 I. & N. Dec. at 636, in concluding that petitioner failed to prove that IUD insertion "involved aggravating circumstances rising to the level of persecution"); Bing Xin Lin v. Holder, 349 F. App'x 665, 667 (2d Cir. 2009) ("[T]he BIA's analysis in Matter of M-F-W- is applicable here . . . . [W]e are not persuaded . . . that the gynecological examinations [petitioner] endured were conducted under 'aggravated circumstances.'"[12]); Yu Chai Huang v. Holder, 311 F. App'x 500, 501 (2d Cir. 2009) (citing

_____

[12] In reaching this conclusion, we observed that the "shame, embarrassment, and humiliation" of an involuntary gynecological examination were insufficient to constitute the requisite aggravating circumstances, reasoning that under a contrary holding "virtually any female asylum applicant from China would establish that she suffered past persecution solely by having attended a mandatory gynecological examination despite her opposition to such

22

In re M-F-W-, 24 I. & N. Dec. at 642, in concluding that petitioner described no "'aggravating circumstances' that would make an IUD insertion persecution in her case"). Two sister circuits have reached the same conclusion, one summarily, see Xiu Rong Chen v. Holder, 313 F. App'x 625, 630 (4th Cir. 2009) (observing that even if BIA's construction "was not the best available interpretation of the statutory language, we certainly cannot say that its interpretation is unreasonable, and we must therefore afford Chevron deference to the BIA's conclusion that an IUD insertion, unaccompanied by any aggravating circumstance, does not generally constitute 'persecut[ion] . . . for other resistance to a coercive population control program' within the meaning of § 1101(a)(42)"), and one implicitly, see Fei Mei Cheng v. Attorney Gen. of U.S., 623 F.3d at 191-92 [3d Cir.] (holding that BIA's "conclusory statement that [petitioner] 'has not shown aggravating circumstances' is not supported by substantial evidence").

By deciding that the BIA reasonably resolved this statutory ambiguity, we do not suggest that the agency could not have made a different choice. We conclude only that the choice it made was not unreasonable. One reason courts do not second-guess a reasonable executive branch choice about the showing necessary to demonstrate persecution under the INA is that the answer necessarily implicates foreign relations, an area where, as the Supreme Court has cautioned, the "judiciary is not well positioned to shoulder primary responsibility

---

examinations. The Immigration and Nationality Act does not anticipate or require such a result." Bing Xin Lin, 349 F. App'x at 667 (internal quotation marks omitted).

23

for assessing the likelihood and importance of [potential] diplomatic repercussions." INS v. Aguirre-Aguirre, 526 U.S. at 425. In such a context, we "must take appropriate account of the greater immigration-related expertise of the Executive Branch, of the serious administrative needs and concerns inherent in the necessarily extensive INS efforts to enforce this complex statute, and the Nation's need to speak with one voice in immigration matters." Zadvydas v. Davis, 533 U.S. 678, 700 (2001) (internal quotation marks omitted). Of course, if Congress takes a different view, it remains free to amend the statute, as it did in 1996, to identify certain conduct as categorically persecutive.

In the absence of any clear congressional directive regarding involuntary IUD insertion, however, we uphold the BIA's reasonable determination that such insertion must be accompanied by aggravating circumstances to demonstrate persecution under 8 U.S.C. § 1101(a)(42).

b.      The BIA's Failure Adequately To Explain Its Application of the Aggravating Circumstances Test in This Case

In rejecting Wong's asylum application, the Board determined that aggravating circumstances were lacking because (1) "the facts presented paint a picture of discomfort resulting from the routine implementation of the family planning policy, rather than persecution"; and (2) although the three days of detention preceding Wong's IUD insertion were "not insignificant," Wong experienced no persecutory harm, as might have been the case if she had also been "beaten or injured." In re M-F-W-, 24 I. & N. Dec. at 644.

We identify two concerns with the Board's analysis that hamper our review of its

24

decision. First, the BIA failed to indicate what, if any, weight it assigned to the involuntary IUD insertion itself in the aggravating circumstances analysis. Second, the BIA did not explain how it distinguished Wong's case from similar circumstances that were found to constitute persecution in In re Chao Qun Jiang, A78 386 894 (B.I.A. Sept. 27, 2006) (denying asylum to Chinese family planning official who participated in such mistreatment). We remand to allow the Board to address these concerns.

        (1)     According Weight to Involuntary IUD Insertion in Assessing Aggravating Circumstances

While the Board acknowledged that involuntary IUD insertion was "certainly intrusive," In re M-F-W-, 24 I. & N. Dec. at 640, it is not clear what weight, if any, it accorded that fact in deciding whether Wong experienced persecution. By emphasizing that the detention preceding the IUD insertion involved no beating or injury and that the IUD itself caused only "discomfort," the BIA's decision might be read to demand proof of aggravating factors that would, by themselves, constitute persecution. See, e.g., Edimo-Doualla v. Gonzalez, 464 F.3d at 283 (holding that physical abuse and violence at hands of government agents may preclude finding of mere harassment); Ivanishvili v. U.S. Dep't of Justice, 433 F.3d at 342 (same). We are not certain, however, that the BIA intended to accord the involuntary procedure at issue – IUD insertion – no weight in its persecution determination.

Even if, consistent with congressional intent, the BIA reasonably declined to recognize all involuntary IUD insertions as categorically persecutive, and even accepting its

factual finding that the medical procedure used to insert Wong's IUD was no different from that used in the case of a voluntary insertion, the Board might well conclude that when such a procedure is involuntary, it bears some weight in a persecution determination. As we have recognized in other contexts, an act that may be voluntarily undertaken can become persecutive where consent is absent. See, e.g., Balachova v. Mukasey, 547 F.3d 374, 386-87 (2d Cir. 2008) ("We have no doubt that rape is sufficiently serious to constitute persecution."). Because involuntary IUD insertion involves a greater affront to privacy and/or autonomy than other mandated population control procedures, e.g., ingestion of a pill or attendance at counseling sessions, the Board might assign the former procedure greater weight in a persecution determination and, for that reason, conclude that the circumstances necessary to aggravate involuntary IUD insertion to the point of persecution would not themselves have to equate to persecution. Until the BIA clarifies these matters, we cannot be certain what it means by "aggravating circumstances" in this context, nor can we determine whether that standard was properly applied in this case. See generally Mufied v. Mukasey, 508 F.3d 88, 93 (2d Cir. 2007) (remanding for BIA to elaborate standard for determining "pattern or practice" of persecution, because "[w]ithout further elaboration," appellate court cannot be sure "how systemic, pervasive, or organized persecution must be before the Board would recognize it as a pattern or practice"); cf. id. ("[A] court cannot 'be expected to chisel that which must be precise from what the agency has left vague and indecisive.'" (quoting SEC v. Chenery Corp., 332 U.S. 194, 196-97 (1947))).

26

Accordingly, while we affirm the BIA's determination that an involuntary IUD insertion must be accompanied by aggravating circumstances to demonstrate persecution, we remand to the BIA so that it can clarify (1) whether circumstances that do not manifest persecution by themselves can establish persecution in conjunction with an involuntary IUD insertion; (2) if so, what weight, if any, it accords the invasive nature of involuntary IUD insertion itself in the aggravating circumstances analysis; and (3) why the particular manner and circumstances of Wong's detention, and the dual requirement that she pay a fine and submit to IUD insertion to secure release from detention, were insufficient to constitute the requisite aggravating circumstances. We do not suggest that detention and/or fine plus involuntary IUD insertion necessarily establish persecution in every case. But we cannot review the Board's decision that they did not do so in this case without a clearer understanding of how it weighed the procedure itself consistent with its obligation to consider all alleged harms cumulatively. See generally Poradisova v. Gonzales, 420 F.3d at 79-80.

(2)    Reconciling the BIA's Decision in this Case with *In re Chao Qun Jiang*

Further supporting our decision to remand is a still unresolved inconsistency between the BIA's treatment of Wong's case and of similar circumstances in In re Chao Qun Jiang, A78 386 894 (B.I.A. Sept. 27, 2006). In Jiang, the agency concluded that the "persecutor bar" statutorily mandated the denial of asylum to an applicant who had herself guarded detainees scheduled for involuntary IUD insertions. See 8 U.S.C. § 1101(a)(42) (providing

27

that term "refugee" does not include person who "ordered, incited, assisted, or otherwise participated in the persecution of any person on account of" protected grounds); id. § 1158(b)(2)(A)(i) (prohibiting Attorney General from granting asylum to alien who "ordered, incited, assisted, or otherwise participated in the persecution of any person on account of" protected ground); see also Yan Yan Lin v. Holder, 584 F.3d 75, 79-80 (2d Cir. 2009) (discussing requirements of persecutor bar). The Board reasoned as follows:

> Only women who opposed and resisted the Chinese policy of forcible birth control would have been detained. Only women who opposed or partially opposed that policy would have IUDs forcibly inserted. Those women resisted the coercive population control policy of the Chinese government and were persecuted by, at a minimum, the combination of detention, the forcible insertion of IUDs, and the implicit threat of continued similar treatment.

In re Chao Qun Jiang, A78 386 894, BIA Op. at 2 (emphasis added). In opposing Jiang's petition for review to this court, the government's argument borrowed from the agency's highlighted language: because "the women were involuntar[ily] detained, had IUDs forcibly inserted, and were threatened with future harm, all due to their resistance to the coercive population control practice, the Board reasonably concluded the women had been persecuted." Br. for Resp't at 12, Chao Qun Jiang v. Bureau of Citizenship & Immig. Servs., 520 F.3d 132 (2d Cir. 2008) (No. 06-4580-ag), 2007 WL 5633308 at *12. These statements define persecution by reference to facts that appear indistinguishable from those present in Wong's case.

On petition for review in Jiang, we noted seeming inconsistency in the Board's

28

assessment of when involuntary IUD insertion constituted persecution, "at least when accompanied by some period of detention," and remanded for the BIA to "articulate a consistent position on 'whether and under what conditions forced insertion of an IUD constitutes persecution.'" Chao Qun Jiang v. Bureau of Citizenship & Immig. Servs., 520 F.3d 132, 135 (2d Cir. 2008) (quoting remand language in Ying Zheng v. Gonzales, 497 F.3d at 203-04). Responding in In re M-F-W-, the Board offered only the general statement that "[t]hese differing results do not stem so much from an inconsistent application of what we find to be persecution as from the fact that our determinations depend on the facts of each case." 24 I. & N. Dec. at 639. This leaves the critical question unanswered: Which facts warrant the different determinations as to persecution in this case and in Jiang? Without clarification on this point, we cannot review the agency's decision to deny relief. See Poradisova v. Gonzales, 420 F.3d at 77 (observing that "minimum level of analysis" by agency is prerequisite to meaningful judicial review). Indeed, without some explanation of how the two decisions can be reconciled, there is a risk that an IJ faced with two petitioners – one subjected to the treatment alleged by Wong, the other a guard who oversaw the first petitioner's detention until she submitted to the IUD insertion – might deny asylum to both: to the former because the circumstances were not sufficiently aggravating to manifest persecution, and to the latter because the same circumstances triggered the persecutor bar. Whatever policy arguments might be made for applying different standards to the identification of persecution when the person seeking asylum is a possible perpetrator rather

29

than a victim, the agency has not drawn such a distinction nor have we identified an obvious textual basis for doing so. See Chao Qun Jiang v. Bureau of Citizenship & Immig. Servs., 520 F.3d at 135 n.5 ("We see no reason why use of the term 'persecution' within the same definition of the statute would have two different meanings."); accord Balachova v. Mukasey, 547 F.3d at 384.

We recognize that the law affords agencies considerable discretion in interpreting – and even re-interpreting – ambiguous statutory text. See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. at 863 ("An initial agency interpretation is not instantly carved in stone."); Yale-New Haven Hosp. v. Leavitt, 470 F.3d 71, 80 (2d Cir. 2006) ("Even in the absence of cumulative experience, changed circumstances or judicial criticism, an agency is free to change course after reweighing the competing statutory policies." (internal quotation marks omitted)). But such action requires explanation. See generally FCC v. Fox Television Stations, Inc., 129 S. Ct. 1800, 1830 (2009) ("[W]hen an agency seeks to change [its] rules, it must focus on the fact of change and explain the basis for that change."). Even assuming the Board does not think In re M-F-W- represents any change in the agency's view of what constitutes persecution, the persistent unexplained inconsistency with Jiang precludes us from conducting a meaningful review. See generally National Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 981 (2005) (observing that "[u]nexplained inconsistency" can support holding that agency interpretation is arbitrary and capricious). Accordingly, we remand for the agency to explain how the facts of this case and those in

30

Jiang support different conclusions.

### 3. The Nexus Requirement

Under the INA as amended by Section 601(a) of the IIRIRA, an alien claiming refugee status on the basis of resistance to coercive population control policies must demonstrate that he was "persecuted . . . for other resistance to a coercive population control program." 8 U.S.C. § 1101(a)(42) (emphasis added). Upon such a showing, the alien "shall be deemed to have been persecuted on account of political opinion." Id. Thus, the Act "requires more than proof of an act of resistance and an unconnected imposition of harm that rises to the level of persecution. There must be a link between the harm and the 'other resistance.'" In re M-F-W-, 24 I. & N. Dec. at 643.[13]

In reviewing Wong's appeal, the Board framed the nexus question as whether family planning officials reinserted an IUD "because of [her] resistance to the insertion of the first IUD" or "merely because reinsertion is a standard procedure in China." Id. Reaching the latter conclusion and finding no indication that "Chinese authorities were somehow singling

---

[13] Because Wong filed her application for asylum prior to enactment of the REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231, 302, her petition is not governed by amendments requiring that an applicant establish that one of the five protected grounds, here political opinion, "was or will be at least one central reason for persecuting the applicant." 8 U.S.C. § 1158(b)(1)(B)(i). Still, a nexus requirement existed before enactment of the REAL ID Act. See INS v. Elias-Zacarias, 502 U.S. 478, 481 n.1 (1992) (observing that grant of asylum would require evidence compelling conclusion that petitioner had well-founded fear that he would be persecuted "because of" political opinion (emphasis in original)); Xu Ming Li v. Ashcroft, 356 F.3d 1153, 1160 (9th Cir. 2004) (en banc) (stating that "applicant must possess a protected characteristic and that protected characteristic must have motivated the persecutor to harm the applicant").

31

[Wong] out for excessive implementation of the family planning policy," the BIA determined that Wong had failed to demonstrate the required nexus. Id. at 644. Before we can review this ruling, the Board needs to clarify whether it categorically concludes that nexus cannot be established by evidence that a person who resisted a population control policy was compelled to submit to a practice, such as IUD insertion, routinely performed in furtherance of that policy. If so, the BIA needs to reconcile this conclusion with Congress's 1996 amendments to the INA, specifically IIRIRA § 601(a), which overruled BIA precedent holding that because coercive population control policies were laws of general application, their enforcement lacked a nexus to persecution. See Matter of Chang, 20 I. & N. Dec. at 44 ("To the extent . . . that such a policy is solely tied to controlling population, rather than as a guise for acting against people for reasons protected by the Act, we cannot find that persons who do not wish to have the policy applied to them are victims of persecution . . . ."); see also H.R. Rep. No. 104-469, pt. I, at 174 (1996) (faulting BIA's position for "effectively preclud[ing] from protection persons who have been submitted to undeniable and grotesque violations of fundamental human rights"). While § 601(a) established categorical refugee status only for persons subjected to involuntary abortion and sterilization, to the extent other routine population control practices can rise to the level of persecution when compelled under aggravating circumstances, it would be appropriate for the BIA to consider whether these amendments signal Congress's intent that the routineness of a procedure should not be a bar to a finding of nexus if the procedure is found – because of the statute or aggravating

32

circumstances – to evidence persecution.

Indeed, on remand, the BIA further needs to reconcile its adverse nexus determination in this case with its seemingly contrary determination in In re Chao Qun Jiang, A78 386 894 (B.I.A. Sept. 27, 2006). Nothing in the record before us indicates why the Board thought the facts in Jiang warranted a conclusion that the IUD insertions at issue in that case were imposed on account of resistance to China's population control policy whereas no such conclusion is warranted here. Most important, on remand, the BIA should clarify whether aggravating circumstances designed to compel submission – e.g., detention, threats, fines, use of force, etc. – can not only elevate a routine practice to the level of persecution, but can also demonstrate the requisite nexus between that persecution and an applicant's opposition to the state's population control policy.

The need for such clarification is only reinforced by apparent government confusion as to the basis for the Board's nexus determination. On appeal, the government suggested that the Board had determined that harm inflicted to ensure compliance with population control policies – rather than to punish a person for resistance – is not properly deemed harm inflicted on account of a protected ground. See Br. for Resp't at 25 ("Wong was required . . . to establish that the reinsertion was meant to punish her on account of her decision to remove the first IUD." (emphasis added)). This position is inconsistent with the Board's own articulation of the nexus standard, which was not limited to punitive acts but cast as a broader question: "whether the IUD is being inserted or reinserted for some resistance that the alien

33

manifested, that is, to target certain individuals for punishment for, or because of, their opposition or resistance to China's family planning policy." In re M-F-W-, 24 I. & N. Dec. at 642 (first emphasis in original; second emphasis added). This comports with the statutory language, which requires a showing that the asylum applicant was persecuted generally "for other resistance," 8 U.S.C. § 1101(a)(42) (emphasis added), and not that he was persecuted specifically as punishment for such resistance.

We accordingly remand for the Board to provide a more detailed articulation of both the nexus standard it applies to asylum claims based on resistance to population control practices once those practices are shown to rise to the level of persecution and its application of that standard to this case.

## III.   Conclusion

To summarize, we conclude as follows:

(1) We lack jurisdiction to review Wong's challenge to the BIA's denial of her request for withholding of removal and CAT relief because Wong failed to exhaust this argument before the agency. We therefore dismiss this part of her petition for lack of jurisdiction.

(2) Wong's challenge to the BIA's rejection of her argument that involuntary IUD insertion equates to involuntary sterilization for purposes of identifying a refugee under 8 U.S.C. § 1101(a)(42), is foreclosed by our decision in Xia Fan Huang v. Holder, 591 F.3d 124. We therefore deny this part of her petition as without merit.

(3) The BIA's determination that involuntary IUD insertion does not constitute

34

persecution absent "aggravating circumstances" warrants <u>Chevron</u> deference. To the extent Wong challenges this requirement, we deny this part of her petition as without merit.

(4) The BIA nevertheless failed to articulate the aggravating circumstances and nexus standards it applied to this case with sufficient clarity to permit judicial review. To the extent Wong challenges these applications, we grant this part of her petition, we vacate the order of removal, and we remand the case for further proceedings consistent with this opinion.

Petition for review DISMISSED in part, DENIED in part, and GRANTED in part. Order of removal VACATED and case REMANDED for further proceedings consistent with this opinion.