11-2749-ag, 11-3217-ag
Y.C. v. Holder, X.W. v. Holder

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2012

(Argued: April 29, 2013                          Decided: December 18, 2013)

Docket Nos. 11-2749-ag, 11-3217-ag

------------------------------------

Y.C.,

*Petitioner*,

- v -

Eric H. Holder, Jr., United States Attorney General,

*Respondent*.

------------------------------------

X.W.

*Petitioner*,

- v -

Eric H. Holder, Jr., United States Attorney General,

*Respondent.*[*]

------------------------------------

Before:     JACOBS and SACK, *Circuit Judges*, and RAKOFF, *District Judge*.[**]

Petitions for review of two decisions by the Board of Immigration Appeals heard in tandem. The decisions denied the petitioners' applications for asylum, withholding of removal, and protection under the Convention Against Torture. Petitioners, both natives and citizens of the People's Republic of China, argue that they each have a well-founded fear of future persecution if removed to China because each has engaged in pro-democracy activities in the United States. We conclude that there is insufficient evidence to establish that Chinese authorities are aware or likely to become aware of the petitioners' pro-democracy activities in the United States, and there is in any event insufficient evidence to suggest that the petitioners would be targeted by Chinese authorities on that basis. Accordingly, we deny Y.C.'s petition for review in its entirety, and deny in part and dismiss in part X.W.'s petition for review.

---

[*] The Clerk of Court is directed to amend the official caption in each case as shown above.

[**] The Honorable Jed S. Rakoff, of the United States District Court for the Southern District of New York, sitting by designation.

THOMAS V. MASSUCCI, New York, NY, *for Petitioner Y.C.*, No. 11-2749-ag.

RUSSELL J.E. VERBY, Senior Litigation Counsel, Office of Immigration Litigation (Tony West, Assistant Attorney General, Civil Division, and Kristin A. Moresi, Trial Attorney, Office of Immigration Litigation, *on the brief*), United States Department of Justice, Washington, D.C., *for Respondent*, in No. 11-2749-ag.

GANG ZHOU, New York, NY, *for Petitioner X.W.*, in No. 11-3217-ag.

RUSSELL J.E. VERBY, Senior Litigation Counsel, Office of Immigration Litigation (Tony West, Assistant Attorney General, Civil Division, Luis E. Perez, Senior Litigation Counsel, and Remi da Rocha-Afodu, Attorney, Office of Immigration Litigation, *on the brief*), United States Department of Justice, Washington, D.C., *for Respondent*, No. 11-3217-ag.

SACK, *Circuit Judge*:

Petitioner Y.C. seeks review of a 2011 order of the Board of Immigration Appeals ("BIA") affirming a 2009 decision of Immigration Judge ("IJ") Sandy K. Hom, which denied Y.C.'s application for asylum, withholding of removal, and relief under the Convention Against Torture, Dec. 10, 1984, S. Treaty Doc. No. 100-20 (1988) ("CAT"). Petitioner X.W. seeks review of a 2011

order of the BIA affirming a 2009 decision of IJ Alan Vomacka, which pretermitted X.W.'s application for asylum and denied his application for withholding of removal and CAT relief. Both petitioners premised their applications on pro-democracy activities in which they engaged after arriving in the United States, including the publication of articles criticizing the Chinese government. Although both petitioners assert that they revealed their participation in pro-democracy organizations on the Internet, neither adduced sufficient evidence that Chinese authorities are aware or likely to become aware of their political activities in the United States or that they will in any event be persecuted on that basis. Y.C.'s petition for review is therefore denied in its entirety; X.W.'s petition for review is denied in part and dismissed in part.

## BACKGROUND

*Y.C.*

Y.C., a native and citizen of the People's Republic of China and of Korean descent, entered the United States in December 2003. In November 2004, she filed an application for asylum, withholding of removal, and CAT relief on the basis of her political opinion. At a hearing in March 2005, before IJ Hom, Y.C. testified to the following effect: She was terminated from her accounting job in

4

China for "whistle blowing," after asserting the misuse of company funds. Afterward, she was unable to find new employment. She left China for the United States in November 2003. Upon her arrival here, she joined the Chinese Alliance for Democracy[1] ("CAD"), which is described as a democratic association opposed to communism. Y.C. testified that she performed volunteer secretarial work for the CAD. She further stated that her husband, who remains in China, was visited by Chinese authorities who advised him to tell Y.C. to stop working for the CAD. In further support of her application, Y.C. submitted, among other things, a copy of an article she wrote for the November 2004 issue of *Beijing Spring*, a CAD publication. The article is a brief editorial recounting her escape from China and subsequent membership in the Chinese pro-democracy movement. Y.C. did not present any corroborating evidence from her husband or from fellow CAD members familiar with her pro-democracy activities in the United States.

In an oral decision, IJ Hom denied Y.C.'s application for asylum, withholding of removal, and CAT relief. The IJ found that any harassment Y.C.

---

[1] Y.C. refers to this organization variously as the "Chinese Alliance for Democracy," the "Chinese Democracy Unity" and the "Chinese Democratic Association."

endured in China arose from an employment dispute and did not rise to the level of persecution on the basis of a protected ground. The IJ also concluded that Y.C. failed to demonstrate an objectively reasonable well-founded fear of future persecution on the basis of her pro-democracy activities in the United States, noting that she had offered only scant, general testimony in support of this claim.

Y.C. appealed to the BIA, which, in 2006, affirmed the IJ's decision without opinion. In February 2008, this Court granted Y.C.'s first petition for review and remanded the case to the BIA. We found no error in the IJ's denial of Y.C.'s past persecution claim, but concluded that the IJ failed to address Y.C.'s claim that she feared future persecution on the basis of the *Beijing Spring* article. On remand, the BIA vacated its prior decision affirming the IJ's decision and remanded the case to the IJ to consider Y.C.'s claim of future persecution based on her pro-democracy activities in the United States.

On remand, Y.C. submitted the following documentary evidence: (1) a letter dated September 1, 2004, from the CAD attesting that she had been a member of the organization since July 2004, that she volunteered at one of the organization's departments, and that she published articles in *Beijing Spring*; and (2) a letter dated January 28, 2009, from her husband stating that local public

6

security officers had visited his home in China eight times since 2005, informing him that they were aware of Y.C.'s pro-democracy activities in the United States and instructing him to tell her to stop or she will be punished upon her return to China.

At a hearing in February 2009, Y.C. appeared before IJ Hom to supplement the record with respect to her future persecution asylum claim.[2] Y.C. testified that she assisted the CAD by typing, filing, and cleaning. She attended CAD meetings and participated in candlelight vigils in front of the Chinese Embassy in New York.

Y.C. repeated her previous testimony that she published one editorial in *Beijing Spring* and that her husband informed her that local authorities in China were aware of her pro-democracy activities in the United States. Y.C. acknowledged that the article she wrote did not include her husband's name or the city where he lived, and she conceded that she does not know whether the magazine is circulated in China, much less how Chinese

---

[2] At some point prior to the hearing, Y.C. moved to Chicago. It is unclear whether she has continued her affiliation with the CAD since then, or whether she has engaged in other pro-democracy activities while there.

authorities would have discovered that she wrote the article. Y.C. asserted, however, that the Chinese government knows "all the names."

In March 2009, the IJ again denied Y.C.'s application for asylum, withholding of removal, and CAT relief. The IJ gave little evidentiary weight to the letters from the CAD and Y.C.'s husband because they were not given under oath and because they lacked evidence of authenticity. The IJ also faulted Y.C. for failing to present any evidence corroborating her pro-democracy activities in the United States, particularly because the CAD is headquartered in New York City and a fellow CAD member or participant in the candlelight vigils might have appeared or submitted a sworn affidavit with ease. The IJ also thought significant the fact that Y.C. did not know whether *Beijing Spring* was circulated in China. Accordingly, the IJ concluded that Y.C. had not satisfied her burden of proof for either asylum or withholding of removal, and, because she had not offered any evidence that she would be tortured in China, had failed to establish eligibility for CAT relief.

Y.C. appealed to the BIA, which, in June 2011, dismissed her appeal. The BIA concluded that Y.C. had not established that she is affiliated with an organization that is banned in China, or that the Chinese authorities have any

concerns directed at CAD members. The BIA determined that, even if the CAD were a banned organization, Y.C. had not demonstrated that the authorities in China were aware or likely to become aware of her involvement in the organization. Specifically, the BIA determined that there was no evidence heat her brief editorial was ever circulated in China or posted on the Internet in a manner that Chinese authorities could access it. Furthermore, the BIA reasoned, Y.C.'s claim that she participated in annual candlelight vigils at the Chinese embassy was insufficient to show that the Chinese government could identify her or would attempt to target her.

The BIA further concluded that, even if the Chinese government were aware of Y.C.'s pro-democracy activities, there was no evidence in the record establishing how the government would view her activities in the United States, or that it would treat her similarly to political dissidents who carry out their activities in China. The BIA therefore agreed that Y.C. had failed to meet the evidentiary burden for asylum and withholding of removal relief, and that she had not demonstrated eligibility for CAT relief.

*X.W.*

X.W., a native and citizen of the People's Republic of China, entered the United States in November 2003 and, in June 2008, filed an application for asylum, withholding of removal, and CAT relief, on the basis of his political opinion. In a written statement attached to his application, X.W. asserted that he had been arrested, detained for 15 days, beaten and kicked in the stomach, and fined in June 2001 because he protested the local government's denial of disaster assistance after a typhoon destroyed his family's home and crops. Additionally, X.W. stated that, if returned, he feared he would be persecuted for his current and active membership in the Chinese Democracy Party ("CDP"), which operates in the United States.

At a hearing in August 2009 before IJ Vomacka, X.W. testified that he joined the CDP in June 2007. Since then, he has participated in many pro-democracy demonstrations, including protests in front of the United Nations and the Chinese Embassy. He also assisted with the CDP's recruitment efforts by stuffing envelopes with pre-printed CDP propaganda, addressing the envelopes – using his personal information as the return address – and mailing them to university students in China.

10

X.W. testified that evidence of his pro-democracy activities is available on the Internet. First, X.W. created an individual member page on the CDP's website; the page includes his headshot, a summary of his CDP activities, and links to photographs of him protesting in New York. Moreover, X.W. published two articles on his CDP member site: one, dated September 2007, briefly discusses X.W.'s view that China's Communist Party oppresses peasant farmers; and a second, dated November 2007, blames the difficulties faced by Chinese peasants on government corruption. In his November 2007 essay, X.W. noted that he had not take up his pro-democracy activities until he came to the United States.

With respect to the timeliness of his application, X.W. testified that he did not apply for asylum when he first arrived in the United States on the advice of an unidentified lawyer. Although he joined the CDP in June 2007, he asserted that he did not discover the Chinese government's negative view of the organization until December 2007. X.W. testified that he did not apply for asylum at that point because he intended to return to China to visit his ailing grandfather, who died the following February.

In an oral decision in August 2009, the IJ denied X.W.'s asylum application on the basis of his failure either to file it within one year of his arrival in the United States or to demonstrate changed or extraordinary circumstances under 8 U.S.C. § 1158(a)(2)(D). In doing so, the IJ doubted X.W.'s explanation that he initially delayed filing his application on the advice of unidentified counsel. Furthermore, the IJ noted that X.W. did not file his application within a reasonable time after he began his activities with the CDP. And the IJ found that the illness of X.W.'s grandfather was not a credible excuse for his delay in filing, nor did it create the extraordinary circumstances necessary to justify this delay.

The IJ determined that X.W. was not credible because of inconsistencies between his written asylum application and his testimony as to the number of times he was kicked during his detention in China in June 2001. The IJ also based the adverse credibility determination in part on his observation that X.W. was nonresponsive at the hearing, and that he "engaged in a certain kind of filibustering in regard to certain questions." In addition to finding that X.W. was not credible regarding his alleged persecution while still living in China, the IJ

12

concluded that this lack of credibility also called into question X.W.'s testimony related to his activities in the United States.

Having found X.W.'s asylum application untimely, the IJ went on to conclude that X.W. failed to meet his burden for withholding of removal and for CAT relief. The IJ found that the Chinese government was not aware or likely to become aware of X.W.'s pro-democracy activities because X.W. had only a low-level role in the CDP, and because X.W.'s relatively common name made it unlikely that the Chinese government could identify him from his CDP member site. The IJ also noted that a letter X.W. submitted from his parents did not indicate that authorities in China had become aware of his activities with the CDP. Moreover, the IJ was not persuaded that the Chinese government has persecuted or would persecute members of the CDP who had only been active in the United States, and there was little evidence in the record to support such a claim. Although X.W. did alert the IJ to the experience of one CDP member who was arrested in China as a result of his political activity there, the IJ found that this single incident was insufficient to demonstrate that persecution was probable, as opposed to merely possible, upon X.W.'s return.

X.W. appealed to the BIA, which dismissed his appeal in July 2011. The BIA agreed with the IJ that the death of X.W.'s grandfather was not an "extraordinary circumstance" excusing the untimely filing of his asylum application because it was not "directly related," within the meaning of 8 C.F.R. § 1208.4(a)(5), to his failure to meet the deadline. In any event, according to the BIA, X.W. did not file his application within a reasonable time after joining the CDP in June 2007. The BIA also perceived no clear error in the IJ's adverse credibility determination, noting that X.W.'s testimony was at times inconsistent, vague, and nonresponsive.

Nonetheless assuming that X.W.'s testimony was credible, the BIA concluded that X.W. failed to meet his burden for asylum, withholding of removal, and CAT relief on the merits because he did not establish a well-founded fear of persecution based on his activities with the CDP. The BIA agreed with the IJ that X.W.'s activities were low-level, and that there was no evidence suggesting that Chinese authorities had knowledge of them. Y.C. and X.W. now petition this Court for review of the BIA's decisions.

**DISCUSSION**

I.  Legal Standards

*A.  Standard of Review*

"When the BIA briefly affirms the decision of an IJ and adopts the IJ's reasoning in doing so, we review the IJ's and the BIA's decisions together." *Jigme Wangchuck v. Dep't of Homeland Sec.*, 448 F.3d 524, 528 (2d Cir. 2006) (internal quotation marks and brackets omitted).  When the BIA does not expressly adopt the IJ's decision, but "closely tracks the IJ's reasoning," we also may review both decisions.  *Id.*  We review the BIA's "legal conclusions *de novo*, and its factual findings, including adverse credibility determinations, under the substantial evidence standard." *Shi Jie Ge v. Holder*, 588 F.3d 90, 93-94 (2d Cir. 2009) (citation omitted).  We generally defer to the agency's evaluation of the weight to be afforded an applicant's documentary evidence.  *Xiao Ji Chen v. U.S. Dep't of Justice*, 471 F.3d 315, 342 (2d Cir. 2006).  Similarly, an applicant may be required to provide corroborating evidence to substantiate his or her claim or to explain why such documentation is unavailable, and an IJ may rely on the failure to submit

such evidence in evaluating whether the applicant has met the relevant burden of proof. *Kyaw Zwar Tun v. INS*, 445 F.3d 554, 563-64 (2d Cir. 2006).

*B. Asylum, Withholding of Removal, and CAT Relief*

To establish eligibility for asylum, an applicant must show that he or she is a "refugee" – that is, a person outside the country of his or her nationality who is unable or unwilling to return to that country because he or she has suffered persecution, or has a well-founded fear of future persecution, on account of his or her race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1101(a)(42). An asylum applicant can show a well-founded fear of future persecution in two ways: (1) by demonstrating that he or she "would be singled out individually for persecution" if returned, or (2) by proving the existence of a "pattern or practice in [the] . . . country of nationality . . . of persecution of a group of persons similarly situated to the applicant" and establishing his or her "own inclusion in, and identification with, such group." 8 C.F.R. § 1208.13(b)(2)(iii). Importantly, "to establish a well-founded fear of persecution in the absence of any evidence of past persecution, an alien must make some showing that authorities in his [or her] country of nationality are

16

either aware of his [or her] activities or likely to become aware of his [or her] activities." *Hongsheng Leng v. Mukasey*, 528 F.3d 135, 143 (2d Cir. 2008) (per curiam). For an asylum claim, the applicant must show a "reasonable possibility" of future persecution. *Id.*

To establish eligibility for withholding of removal, an applicant must show that it is more likely than not that "his or her life or freedom would be threatened in [China] on account of [the applicant's] race, religion, nationality, membership in a particular social group, or political opinion." 8 C.F.R. § 1208.16(b). Whereas an asylum claim requires only a reasonable possibility of future persecution, withholding of removal requires the applicant to show a "clear probability" that such persecution will occur if the applicant is returned to his or her home county. *Hongsheng Leng*, 528 F.3d at 143.

To establish eligibility for CAT relief, the applicant must show that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2).

17

## II. Y.C.

In an apparent misreading of our decision in *Shi Jie Ge v. Holder*, 588 F.3d 90 (2d Cir. 2009), the BIA concluded that Y.C. could not establish her status as a refugee because there is no evidence that the CAD is a banned organization in China. In *Ge*, we decided that the petitioner, a member of the CDP, "may . . . demonstrate a well-founded fear of future persecution by demonstrating that his involvement in a banned organization may become known *after* his return." *Id.* at 96. That statement was not a suggestion that the Chinese government's banning of a pro-democracy organization is a legal prerequisite to a successful asylum claim, nor was it intended to restrict the availability of asylum to members of the CDP.[3] Instead, our reference to a "banned" organization was specific to the facts of the case. *See* U.S. Dep't of State, *Country Reports on Human Rights Practices: China (includes Tibet, Hong Kong, and Macau)*, at 5 (Mar. 11, 2008) (characterizing

---

[3] Indeed, we have reviewed claims brought by members of several other pro-democracy groups in the United States. *See, e.g.*, *Yinghua Jin v. Holder*, 517 F. App'x 43 (2d Cir. 2013) (summary order) (Chinese Democracy and Justice Party); *Ying Chen v. Holder*, 368 F. App'x 202 (2d Cir. 2010) (summary order) (Federation for Democracy in China); *Yan Zheng Weng v. Holder*, 372 F. App'x 126 (2d Cir. 2010) (summary order) (Christian Democracy Party); *Xiu Li Zhao v. Holder*, 359 F. App'x 190 (2d Cir. 2009) (summary order) (China Freedom and Democracy Party).

18

the CDP as "banned"). And while the fact that a political organization is banned in China may be probative of the government's awareness of that organization's members and activities, it is neither a proxy for such awareness, nor is it the only evidence with which an applicant might prove his or her claim.

The apparent error in the BIA's analysis, however, was harmless. The agency went on to conduct a *de novo* review of Y.C.'s fear-of-future-persecution claim without relying on the purported banned organization "requirement." Substantial evidence in the record supports the agency's conclusion that Y.C. failed to demonstrate that Chinese authorities are aware or likely to become aware of her pro-democracy activities in the United States such that there is a reasonable possibility that she would be persecuted in China. Y.C. offered two examples of pro-democracy activity in the United States for which she feared persecution in China: (1) the publication of her *Beijing Spring* editorial; and (2) her participation in candlelight vigils.

With respect to the first, Y.C. did not adduce sufficient evidence that Chinese authorities are aware of her publication of the *Beijing Spring* article. Y.C. did present some evidence that Chinese authorities monitor the Internet for

content the state deems controversial.  The U.S. Department of State Country Report for China notes that the Chinese government "took steps to monitor Internet use, control content, restrict information, and punish those who violated regulations."  U.S. Dep't of State, *Country Reports on Human Rights Practices: China (includes Tibet, Hong Kong, and Macau)*, at 16 (Mar. 11, 2008).   However, Y.C. testified that she did not know whether *Beijing Spring* is circulated in China. Moreover, even if we accept Y.C.'s suggestion that the Chinese government is aware of every anti-Communist or pro-democracy piece of commentary published online – which seems to us to be most unlikely – her claim that the government would have discovered a single article published on the Internet more than eight years ago is pure speculation.  *See Jian Xing Huang v. INS*, 421 F.3d 125, 129 (2d Cir. 2005) (per curiam) ("In the absence of solid support in the record . . ., [an applicant's] fear is speculative at best."); *Yue Wen Zhong v. Holder*, 482 F. App'x 628, 630 (2d Cir. 2012) (summary order) ("Although Zhong argues that the Chinese government would have discovered the [four] anti-Communist articles that he published on the internet, that claim is speculative.").

Similarly, Y.C. failed to establish that Chinese authorities are aware of her participation in candlelight vigils. The only evidence suggesting such awareness is the letter from Y.C.'s husband stating that the Chinese authorities had visited him at home to warn him that they knew his wife wrote an article critical of the Chinese Communist Party and that she participated in demonstrations outside the Chinese Consulate in New York City. The agency gave the letter "very little evidentiary weight," both because it was unsworn and because it was submitted by an interested witness. We defer to the agency's determination of the weight afforded to an alien's documentary evidence. *Xiao Ji Chen*, 471 F.3d at 342. Coupled with Y.C.'s failure to provide any corroborating evidence of her participation in candlelight vigils at all, we again find no "solid support" for the claim that the Chinese government knows of Y.C.'s participation in such demonstrations. Thus, there is insufficient evidence from which we would be permitted to conclude that Chinese authorities are aware or likely to become aware of her pro-democracy activities in the United States.

Even if Chinese authorities were aware of her pro-democracy activities, moreover, nothing in the record compels a finding that Y.C. would be

persecuted on that basis if returned to China. The BIA noted that Y.C. had not shown that anyone involved in the CAD has faced problems upon his or her return to China. As described above, one way for an alien to demonstrate a well-founded fear is to show a pattern or practice in the home country of persecution of persons "similarly situated" to the applicant. *See* 8 C.F.R. § 1208.13(b)(2)(iii)(A). But, contrary to the implication of the BIA's ruling, "similarly situated" persons need not present a total identity of circumstances. If that were so, the first member of a democracy organization in the United States facing deportation would never be able to establish a well-founded fear of future persecution. The BIA's evidentiary standard would treat this person as a veritable "miner's canary," who might be returned only to perish for the benefit of future applicants.

Regardless, there is insufficient evidence in the record from which we can conclude that Y.C. is at risk of persecution if returned to China. She cites to the example of Wang Bingzhang, a founder of the CAD, who had lived in the United States from 1982 to 1998; Wang Bingzhang was arrested and sentenced to life imprisonment after he used a false passport to re-enter China in order to establish the China Democracy and Justice Party. *See* U.S. Dep't of State, *China:*

22

*Profile of Asylum Claims and Country Conditions*, at 18 (June 2004). Whereas Y.C. occasionally cleaned and filed papers for the CAD, and published a single editorial – activity we would not characterize as "high profile" – Wang Bingzhang spearheaded not one, but two pro-democracy organizations. Moreover, the State Department report notes that "[some of Wang Bingzhang's] post-1982 political activities took place in China, distinguishing his case from those that involved activity only in the United States." *Id.* The record is silent as to whether the Chinese government views domestic pro-democracy advocates differently from Chinese nationals who espouse pro-democracy ideals abroad. We cannot conclude that Wang Bingzhang and Y.C. are similarly situated, or that the example of Wang Bingzhang establishes a pattern or practice of persecution of similarly situated persons such that Y.C. harbors an objectively reasonable fear of persecution if she is returned to China. *Cf. Yan Zhu Tang v. Holder*, 429 F. App'x 59, 60 (2d Cir. 2011) (summary order) ("The evidence Tang submitted . . . indicates that the prominent leaders of pro-democracy movements outside of China and political dissidents within China have been persecuted. However, as the agency found, their persecution does not establish that Tang is also at risk of persecution

23

if she [is] returned to China because she has been only a low-level activist outside of China.").

The agency reasonably determined that Y.C. failed to demonstrate a well-founded fear of persecution. Accordingly, there is no error in the denial of her application for asylum. Because her claims for withholding of removal and CAT relief are based on the same set of facts but are subject to a higher burden of proof, there is no error in the agency's denial of Y.C.'s withholding of removal and CAT claims.

III. X.W.

*A. Timeliness of X.W.'s Asylum Application*

An asylum application must be "filed within 1 year after the date of the alien's arrival in the United States," 8 U.S.C. § 1158(a)(2)(B), unless the applicant establishes "changed circumstances which materially affect the applicant's eligibility for asylum," *id.* § 1158(a)(2)(D). Changed circumstances can include "activities the applicant becomes involved in outside the country of feared persecution that place the applicant at risk." 8 C.F.R. § 1208.4(a)(4)(i)(B). Under 8 U.S.C. § 1158(a)(3), no court shall have jurisdiction to review the BIA's finding that

24

an asylum application was untimely, or its finding that no change of circumstances excused the late filing. *See also Xiao Ji Chen*, 471 F.3d at 323-24. The Court does, however, retain jurisdiction to review constitutional claims and questions of law. 8 U.S.C. § 1252(a)(2)(D); *Shi Jie Ge*, 588 F.3d at 94.

X.W.'s asylum application was filed almost five years after his entry into the United States, and the BIA found that the death of his grandfather did not excuse the late filing. Moreover, even if X.W.'s CDP activities constituted "changed circumstances," X.W. waited for one year after joining the CDP to file his asylum application, a delay the BIA found to be unreasonably long. X.W. now attempts to salvage jurisdiction over his pretermitted asylum claim by arguing that the BIA denied him due process. Although the exact contours of X.W.'s challenge are unclear, he appears to argue that the BIA denied him due process by engaging in appellate factfinding. *See, e.g., Padmore v. Holder*, 609 F.3d 62, 67 (2d Cir. 2010) (per curiam) ("[W]hen the BIA engages in factfinding in contravention of 8 C.F.R. § 1003.1(d)(3)(iv), it commits an error of law, which we have jurisdiction to correct."[4]).

----

[4]     8 C.F.R. § 1003.1(d)(3)(iv) provides that, with the exception of taking "administrative notice" of "commonly known facts," the BIA "will not engage in factfinding in the course of deciding appeals."

X.W. has been afforded a full and fair opportunity to litigate his claims before the BIA and this Court. We can find no discrepancies between the IJ's findings of fact and those relied on by the BIA, much less any evidence of inappropriate appellate factfinding. Instead, the BIA explicitly affirmed the pretermission of X.W.'s asylum application and properly applied *de novo* review when considering whether he had sustained his burden of proof with respect to his withholding of removal claim. We have rejected attempts to frame disagreements over factfinding as constitutional claims or legal questions. *See, e.g., Barco-Sandoval v. Gonzales*, 516 F.3d 35, 42 (2d Cir. 2008). Inasmuch as his petition does not raise a constitutional claim or question of law, we lack jurisdiction to review the BIA's pretermission of his asylum application. X.W.'s petition for review with respect to his asylum claim is dismissed.

B. *Withholding of Removal*

X.W. does not challenge on appeal the BIA's denial of his application for CAT relief, so it is deemed waived. X.W.'s only remaining claim is for withholding of removal.

At the outset, X.W. challenges the IJ's adverse credibility finding. However, "[t]o preserve a claim, we require petitioner to raise *issues* to the BIA to

preserve them for judicial review." *Foster v. INS*, 376 F.3d 75, 78 (2d Cir. 2004) (per curiam) (internal quotation marks, citation, and brackets omitted). This issue exhaustion requirement is mandatory. Where, as here, "the government points out . . . that an issue . . . was not properly raised below, [we] must decline to consider that issue" absent extraordinary circumstances. *Lin Zhong v. U.S. Dep't of Justice*, 480 F.3d 104, 107 n.1 (2d Cir. 2007).

X.W. failed to raise the credibility issue to the BIA, and he is thus precluded from challenging the IJ's credibility determination for the first time in his petition in this Court.[5] And while we decline to consider the credibility issue ourselves and in the first instance, *Theodoropoulos v. INS*, 358 F.3d 162, 171 (2d Cir. 2004), it is of no moment: The BIA presumed X.W.'s credibility in conducting its *de novo* review.

Our task is to determine whether there is substantial evidence supporting the BIA's determination that X.W. failed to establish his eligibility for withholding of removal. We emphasize that Y.C. and X.W. are not similarly situated, inasmuch as X.W., having forfeited his asylum claim, must meet the

---

[5] The exhaustion bar is equally applicable to arguments that the IJ engaged in improper conduct and distorted the record, which X.W. raises for the first time here.

27

stricter standard for withholding of removal: that it is more likely than not that his life or freedom will be threatened because of his pro-democracy activities if he is returned to China. *See* 8 C.F.R. § 1208.16(b)(2). X.W. has failed to sustain his burden.

There is some evidence to suggest that Chinese authorities could become aware of his pro-democracy activities in the United States. X.W. has a member page on the CDP website that identifies him by name, displays his head shot, and includes links to photographs of him participating in protests and stuffing envelopes. Again, the State Department reports that Chinese authorities monitor the Internet and, as the government is openly hostile to the CDP, there is reason to believe the CDP website in New York might be of interest to it. Nevertheless, it requires a chain of inferences we are unprepared to draw to conclude on the basis of X.W.'s Internet presence that the Chinese government is aware or likely to become aware of his pro-democracy activities. *Cf. Yue Wen Zhong*, 482 F. App'x at 630 (claim that Chinese authorities would discover U.S. CDP member's anti-Communist articles on the Internet was "speculative"). Moreover, X.W. had a relatively low level of involvement in the CDP, and the letter from his parents made no mention of any visits from the police or warnings

28

that X.W. would be retaliated against if he continued his membership in the CDP. Accordingly, we are not convinced that the record compels a conclusion that the Chinese government is likely to be aware of X.W.'s CDP activities. *Cf. Shan Ze Zhang v. Holder*, 443 F. App'x 609, 611 (2d Cir. 2011) (summary order) ("Although Zhang argues that because his [pro-democracy articles published on the CDP website] may be obtained via the Internet he has sustained his burden of showing a reasonable possibility that the Chinese government will become aware of his political activities, we are not persuaded that the record compels this conclusion.").

Even if the Chinese authorities are aware or likely to become aware of X.W.'s pro-democracy activities, it does not follow that it is "more likely than not" that X.W.'s life or freedom will be threatened if he is returned to China. X.W. relies on the example of Huang Xiaoqin, a "vice-director" of the CDP in China. Huang Xiaoqin was convicted of subverting state power in 2003 and sentenced to serve five years in prison after he distributed about 2,000 CDP propaganda flyers at Chinese universities and left a bag of flyers on a train in China. Because X.W. mailed CDP flyers to Chinese university students, he argues that he will suffer the same fate as Huang Xiaoqin if returned to China.

29

We cannot extract from this single example a clear probability that X.W. will be persecuted if returned to China. As in Y.C.'s case, there is no evidence suggesting that Chinese authorities view overseas pro-democracy activities in the same manner as domestic participation in pro-democracy organizations. And, as the agency concluded, it is difficult to compare X.W. and Huang Xiaoqin's relative roles in the CDP without understanding the full extent of the latter's activities in China. *Cf. Shan Ze Zhang*, 443 F. App'x at 611 ("[T]he agency reasonably found that Zhang did not demonstrate that the Chinese government targeted individuals upon their return to China for having participated in CDP activities in the United States, as the evidence he presented either pertained to individuals who engaged in activities within China or did not show the reason for the individual's alleged arrest."); *Yue Wen Zhong*, 482 F. App'x at 630 ("Although several articles in the record reported interrogations and detentions of prominent Chinese nationals who published hundreds of anti-Communist articles on overseas websites, the record does not compel the conclusion that Zhong, who published only four articles from the United States, would be subjected to similar treatment if he returned to China."). Consequently,

the agency reasonably determined that X.W. failed to meet the heightened standard to establish his eligibility for withholding of removal.

### IV. A Final Observation

In recent years, this Court has faced a number of petitions from Chinese nationals who seek asylum or related relief on the ground that they have taken up the pro-democracy cause since their arrival in the United States. *See, e.g.*, *Haolin Li v. Holder*, 491 F. App'x 250, 252 (2d Cir. 2012) (summary order) (the BIA "reasonably found that Li had failed to establish a well-founded fear of persecution because there was no indication that Chinese authorities were aware that Li had previously distributed CDP literature in China or that they were aware of his activities in the United States, because his activities were not published on the internet and he was difficult to identify in pictures"); *Wen Hui Chen v. Holder*, 482 F. App'x 654, 656 (2d Cir. 2012) (summary order) (denying motion to reopen asylum petition on the basis of Chinese alien's later membership in the CDP in the United States). Such cases present this Court with a complex set of considerations, requiring a careful parsing of the legal and factual issues at stake.

As this Court observed in a recent decision relating to China's population policy, Chinese asylum cases tend to be

31

complicated by both political and practical concerns. As to the first, few societies have valued individual liberty as strongly as our own or erected such high legal barriers to government intrusion on personal freedom. Thus, it is not surprising that other governments' restraints on personal autonomy strike us as oppressive. Which of these restraints rise to the level of persecution warranting asylum is not always easy to determine. As for practical considerations, China's population control policy applies in a country of more than 1.3 billion people. The persons opposed to the policy, *i.e.*, the potential applicants for asylum in the United States from that policy, could therefore easily number in the millions. Further complicating the issue is the ease with which opposition to the state's population policy might be invoked to support asylum claims by large numbers of Chinese nationals whose real reason for seeking entry into the United States is the historic motivation for generations of immigrants: the search for better economic opportunities.

*Mei Fun Wong v. Holder*, 633 F.3d 64, 68-69 (2d Cir. 2011) (citation omitted). This observation applies with at least equal force to cases that implicate China's policies on religious or political freedoms.

What makes cases like this one particularly thorny is that pro-democracy claims may be especially easy to manufacture. Any Chinese alien who writes something supportive of democracy (or pays for such writing to be published in his or her name) and publishes it in print or on the Internet may in some cases do so principally in order to assert that he or she fears persecution.

32

And, because Internet postings in particular may become accessible anywhere, the applicant can argue that the Chinese government is aware or likely to become aware of his or her pro-democracy stance.

The petitions we review today reflect the especially strong need in this genre of cases for careful balancing of legal factors – the alien's credibility, the likelihood that the Chinese government is aware of the applicant's pro-democracy beliefs, evidence suggesting that the alien would be targeted because of those beliefs if returned to China, and such – as well as the political and practical concerns to which we have adverted.

## CONCLUSION

For the foregoing reasons, Y.C.'s petition for review is denied in its entirety. X.W.'s petition for review is dismissed with respect to his asylum claim, and denied with respect to his withholding of removal claim.