Espinoza-Tenelcia v. Barr

BIA
Nelson, IJ
A205 523 795

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

## <u>SUMMARY ORDER</u>

RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 23rd day of December, two thousand twenty.

PRESENT:
> PIERRE N. LEVAL,
> ROBERT D. SACK,
> RAYMOND J. LOHIER, JR.,
> > *Circuit Judges.*

_____

DIANNA CORLINA ESPINOZA-TENELCIA,
> *Petitioner,*

v.                                                  18-3431
                                                    NAC

WILLIAM P. BARR, UNITED STATES ATTORNEY GENERAL,
> *Respondent.*

_____

FOR PETITIONER:              Usman B. Ahmad, Long Island City, NY.

FOR RESPONDENT:              Joseph H. Hunt, Assistant Attorney General; M. Jocelyn Lopez Wright,

Senior Litigation Counsel; Margot P. Kniffin, Trial Attorney, Office of Immigration Litigation, United States Department of Justice, Washington, DC.

UPON DUE CONSIDERATION of this petition for review of a Board of Immigration Appeals ("BIA") decision, it is hereby ORDERED, ADJUDGED, AND DECREED that the petition for review is DENIED.

Petitioner Dianna Corlina Espinoza-Tenelcia, a native and citizen of Ecuador, seeks review of a November 1, 2018, decision of the BIA affirming an October 4, 2017, decision of an Immigration Judge ("IJ") denying Espinoza-Tenelcia's application for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). *In re Espinoza-Tenelcia,* No. A 205 523 795 (B.I.A. Nov. 1, 2018), *aff'g* No. A 205 523 795 (Immig. Ct. N.Y. City Oct. 4, 2017). We assume the parties' familiarity with the underlying facts and procedural history.

We have reviewed the IJ's decision as modified and supplemented by the BIA. *See Xue Hong Yang v. U.S. Dep't of Justice*, 426 F.3d 520, 522 (2d Cir. 2005); *Yan Chen v. Gonzales*, 417 F.3d 268, 271 (2d Cir. 2005). The applicable standards of review are well established. *See* 8 U.S.C.

§ 1252(b)(4)(B); *Y.C. v. Holder*, 741 F.3d 324, 332 (2d Cir. 2013).

Asylum and Withholding of Removal

An applicant for asylum or withholding of removal carries the burden to demonstrate that she has experienced, or has a well-founded fear of experiencing, harm inflicted by either the government or by private parties that the government is "unable or unwilling to control." *Pan v. Holder*, 777 F.3d 540, 543 (2d Cir. 2015); *see* 8 C.F.R. §§ 1208.13(a), 1208.16(b). "[T]o demonstrate persecution based on private party violence, an alien must show either that the government condoned the action or, even if it did not, that it was completely helpless to protect the victims." *Scarlett v. Barr*, 957 F.3d 316, 332 (2d Cir. 2020).[1] Substantial evidence

---

[1] Espinoza-Tenelcia's challenge to the legal standard that the BIA applied to her claim is foreclosed by our decision in *Scarlett*, which was decided after the parties filed their briefs. Espinoza-Tenelcia argues that the BIA improperly applied a heightened "condoned or demonstrated a complete helplessness to protect" standard to the "unable or unwilling" component of her claim. *See Matter of A-B-*, 27 I. & N. Dec. 316, 337 (A.G. 2018) (articulating this standard). But in *Scarlett*, we held that the BIA's interpretation of the "unable or unwilling" standard in *Matter of A-B-* was entitled to *Chevron* deference. *Scarlett*, 957 F.3d at 331–34; *see Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984).

3

supports the agency's conclusion that Espinoza-Tenelcia did not meet that burden.

The agency relied in part on the fact that Espinoza-Tenelcia had not attempted to obtain police protection to reach this determination. Espinoza-Tenelcia is correct that her failure to seek police protection, alone, would be insufficient to support the agency's decision. *See Pan*, 777 F.3d at 545 ("[P]olice unwillingness to protect a similarly-situated refugee may establish that the government is unable or unwilling to protect the applicant."); c*f. In re S-A-*, 22 I. & N. Dec. 1328, 1335 (BIA 2000). However, the agency reasonably concluded that the country conditions evidence establishes that government protection is available to those who seek it.

The record reflects that Ecuador provides legal protections to victims of domestic violence: domestic violence is punishable by imprisonment or fines, and there are 50 judicial units and 78 courts specializing in gender-based violence. Certified Administrative Record ("CAR") at 214–15 (2016 U.S. State Dep't Rep.). Ecuadorian law also requires public hospitals to provide specialized reception

4

halls for sexual and domestic violence cases, and the Ministry of Social and Economic Inclusion provides services and subsidizes shelters for victims. *Id.* at 215. Specialized "women's police stations" issue orders of protection and documents requiring abusers to pay maintenance. *Id.* at 291 (Las Marias Rep.).

The record also reflects that these measures are not always successful and domestic violence remains a widespread problem in Ecuador. The U.S. State Department Report indicates that sixty percent of women in Ecuador "suffered from gender-based violence at some point during their lifetimes" and reporting such violence to authorities "continued to be a traumatic process," in part because victims often "fear . . . retribution from the perpetrator or social stigma." *Id.* at 214. Activists view specialized courts to be insufficiently staffed, and their judges to be insufficiently trained, and, at the time of the 2016 report, there were 16,000 pending domestic violence cases. *Id.* at 215. Those who report domestic violence sometimes wait ten days or more for a response from a prosecutor, who must investigate before issuing a restraining order. *Id.* at 214–

5

15. Another report indicates that, "[d]espite significant government progress to introduce legislation to combat domestic violence, including the introduction of women's police stations . . . , only 20% of incidents are currently reported to the police," and a UNWomen Ecuador spokesperson believed rates of violence remained high because the new domestic violence laws "have not changed the culture or the way people think." *Id.* at 291 (Las Marias Rep.).

Espinoza-Tenelcia argues that laws and programs intended to control domestic abusers are unenforced and unfunded due to a "lack of political will," and the gaps in these programs allow violence to continue. She further argues that the high rate of murders of female victims, and the low rate at which these murders are investigated, demonstrate that the government lacks the willingness or ability to enforce laws protecting women from violence. However, as the Government notes, there is little in the record to support Espinoza-Tenelcia's view that the Ecuadorian government adopted domestic violence laws for political gain but is unwilling to enforce them; Espinoza-Tenelcia points only toward the limited number of shelters as evidence of unwillingness to

6

protect women from domestic violence. Moreover, as the Government notes, Espinoza-Tenelcia's assertion that only 0.02% of femicides are investigated in Ecuador mischaracterizes the record: a news article reports that a commission conducted a study of 170 registered homicides, and specialized women's police stations registered 64,427 allegations of domestic violence against female victims, including an unspecified number of murders, an unspecified number of which were then investigated. *Id.* at 287. Espinoza-Tenelcia misinterprets these statistics as stating that only 170 out of 64,427 femicides were registered and investigated. The Government, in turn, cites a news article reporting that "justice has reached 95% coverage on issues of domestic violence," *id.* at 298, but it is unclear what that statement means. In sum, the record does not establish what percentage of domestic violence reports are investigated or result in prosecutions or other protective measures. Although the backlog of domestic violence cases is significant, the agency reasonably concluded that the totality of this evidence did not satisfy Espinoza-Tenelcia's burden to demonstrate that the Ecuadorian government was

unable or unwilling to control her abuser. *See* 8 C.F.R. §§ 1208.13(a), 1208.16(b).[2]

CAT

For similar reasons, the agency's conclusion that Espinoza-Tenelcia did not carry her burden to demonstrate government acquiescence is also supported by substantial evidence. To receive protection under the CAT, an applicant must "establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2). "Torture is defined as any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person . . . by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 1208.18(a)(1); *see also Pierre v. Gonzales*, 502 F.3d 109, 114, 118 (2d Cir. 2007). Government

---

[2] Because the agency's findings regarding the Ecuadorian government's willingness and ability to control Espinoza-Tenelcia's abuser are dispositive, we do not reach Espinoza-Tenelcia's argument that she established a nexus between her feared harm and a protected ground. *See Pan*, 777 F.3d at 543; *INS v. Bagamasbad*, 429 U.S. 24, 25 (1976) ("As a general rule courts and agencies are not required to make findings on issues the decision of which is unnecessary to the results they reach.").

8

acquiescence "requires . . . that government officials know of or remain willfully blind to an act and thereafter breach their legal responsibility to prevent it." *Khouzam v. Ashcroft*, 361 F.3d 161, 171 (2d Cir. 2004); *see* 8 C.F.R. § 1208.18(a)(7).

Espinoza-Tenelcia argues that the high rates of domestic violence in Ecuador, the delays victims experience in obtaining restraining orders, and the backlog of domestic violence cases in Ecuadorian courts establish that the government is aware of or willfully blind to torture and breaches a duty to prevent it; she also argues that the government encourages such violence by allowing perpetrators to act with impunity. But, as discussed above, the record reflects that the Ecuadorian government has enacted laws against domestic violence and has put in place systems to prosecute crimes and provide some support to victims. Although these systems undoubtedly have gaps and domestic violence remains a significant problem in Ecuador, the agency reasonably concluded that the evidence did not establish that it was more likely than not that the Ecuadorian government would acquiesce to Espinoza-Tenelcia's torture.

For the foregoing reasons, the petition for review is DENIED. All pending motions and applications are DENIED and stays VACATED.

                              FOR THE COURT:
                              Catherine O'Hagan Wolfe,
                              Clerk of Court